**INDIAN HEAD INDUSTRIES, INC., Plaintiff,**

v.

**TED SMITH EQUIPMENT CO., INC. and T.S.E. Brakes, Inc., Defendants.**

**T.S.E. BRAKES, INC., Plaintiff,**

v.

**INDIAN HEAD INDUSTRIES, INC., Defendant.**

Nos. 92–CV–74367–DT, 92–CV–76689–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 8, 1994.

**1096**

John W. Allen, William G. Asmakis, Jr., Raymond E. Scott, Theodore W. Olds, Howard & Howard, Bloomfield Hills, MI, for plaintiff.

Robert Berliner, Leonard D. Messinger, Robbins, Dalgarn, Berliner & Carson, Los Angeles, CA, Stephen T. Olson, Harness, Dickey & Pierce, Troy, MI, for defendants.

## OPINION AND ORDER

FEIKENS, District Judge.

The question before me is whether certain patents owned by plaintiff, Indian Head Industries, Inc. ("Indian Head"), are invalid for obviousness under 35 U.S.C. § 103. I conclude that the patents are non-obvious as a matter of law.

### I. Background

This suit concerns two patents for a tamper-resistant dual-diaphragm spring-brake actuator, U.S. Patent Nos. 5,067,391 ('391 Patent) and 5,205,205 ('205 Patent). A dual-diaphragm spring-brake actuator (whether tamper resistant or not) is part of a braking system commonly used on semi-tractor trailers and other large trucks. A diagram depicting Indian Head's "tamper-resistant" dual-diaphragm spring-brake actuator is shown in the figure below. Indian Head, a company which manufactures spring brakes through its MGM division, owns these patents by assignment.

The bottom chamber shown in the figure commonly is referred to as the "service" chamber. When a driver applies a truck's brakes, pressurized air is directed into the top part of the service chamber (above the rubber diaphram shown at 9 in the figure). This asserts pressure on the diaphragm, which moves the rod shown at 8 and sets the brake.

At the far top of the actuator is a 3000-pound "power spring." When the truck engine is running, the top chamber (also called the "emergency" chamber) remains filled with highly pressurized air, which forces the top diaphragm (shown at 4 in the figure) upward. This compresses the power spring. (The spring is completely compressed in the

picture and accordingly looks like five circles on each side of the diagram.)

The power spring remains compressed as long as the system remains pressurized. If the air system fails or is turned off, the power spring will expand, pushing the rod downward and setting the brake. This acts as an emergency brake and is designed to stop a runaway truck. It also serves as a parking brake.

Before the development of "tamper resistant" dual-diaphragm spring-brake actuators, Indian Head, like many of its competitors, attached the upper casing (3) to the aluminum flange case (the middle section) with a removable clamp band similar to the clamp band which holds the service chamber together. The upper diaphragm was held in place between the top cover and the aluminum flange of the actuator.

The clamp bands can be removed by loosening the bolts. The lower chamber contains only a low strength spring and may be opened safely. The 3000–pound power spring in the upper chamber remains partially compressed even when the truck engine is turned off, however. When released, the power spring, unless properly "caged," explodes away from the adaptor case. In the past, inexperienced drivers or mechanics servicing the brakes sometimes opened the wrong chamber by mistake without first caging the power spring. This has led to a number of injuries or deaths.

Indian Head's solution to the problem of inexperienced persons opening the wrong chamber is to eliminate the use of the clamp band which holds the upper chamber to the aluminum flange case. To do this, it essentially bent the lower lip of the upper casing around the aluminum flange case, as shown in the area of 4 of the figure, thus preventing inexperienced persons (or anyone else for that matter) from opening the emergency chamber. Patents '391 and '205 pertain to this new sort of "tamper resistant" dual-diaphragm spring-brake actuator (the "TR brake").

This suit arises because Ted Smith Equipment Co. and T.S.E. Brakes, Inc. (collectively, "TSE") manufacture their own version of the TR brake, which they call the "Permanent Clamp" or "PC" brake. Indian Head sues TSE, claiming that the PC brake infringes on both the '391 and '205 patents and that the alleged infringement is willful. TSE denies that its PC brake infringes the Indian Head patents or that any alleged infringement is willful. It also raises a number of affirmative defenses. One of these is that Indian Head's patents are invalid under 35 U.S.C. § 103 because they are obvious.

The parties have filed motions and cross-motions for summary judgment. TSE moves on various issues pertaining to infringement, invalidity due to obviousness, and invalidity due to various legal insufficiencies. Indian Head moves on the issues of infringement (both literal and by the doctrine of equivalents) and willfulness and on TSE's affirmative defenses of invalidity due to prior inventions, invalidity due to obviousness, and invalidity due to legal insufficiencies. I decided that the best way to tackle the numerous complicated issues involved in these motions was to focus first on whether the patents are invalid for obviousness. I accordingly held a hearing on that issue beginning on April 26, 1994 during which the parties were permitted full opportunity to present both documentary and testimonial evidence relevant to issue of obviousness.[1]

## II. Obviousness

The law presumes that patents are valid. 35 U.S.C. § 282. A challenger to a

---

**1.** Plaintiff's attorney consistently objected to the format of the hearing, arguing that my hearing evidence in court violated his client's right to a jury trial. Those objections misunderstood my purpose in holding this hearing. I did not, as plaintiff's counsel feared, hold the hearing to decide questions of fact. Instead, I used the hearing as a pedagogical device to assist me with the rather complicated task of learning about spring brakes in general and the relevant patents in particular so that I could determine what the disputed and undisputed facts are. *See* 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2723 (1983) (noting that Fed. R.Civ.P. 43(e) and 56(c) permit oral testimony during a summary judgment motion when there is reason to believe that it will be of significant assistance to the court). Plaintiff's counsel's concerns aside, I am well aware that the evidence heard was presented on cross-motions for summary judgment and not in connection with a bench trial.

patent's validity can only overcome this presumption by clear and convincing evidence showing invalidity. *Avia Group International, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1562 (Fed.Cir.1988); *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 894 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). 35 U.S.C. § 103 states that only "non-obvious" patents are valid:

### § 103. Conditions for patentability; non-obvious subject matter

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

■ Whether an invention is invalid for obviousness is a question of law, although a factual inquiry underlies the legal determination. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Gardner v. TEC Systems, Inc.,* 725 F.2d 1338, 1344 (Fed.Cir.) (en banc), *cert. denied,* 469 U.S. 830, 105 S.Ct. 116, 83 L.Ed.2d 60 (1984); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1535 (Fed.Cir. 1983); *see also EWP Corp. v. Reliance Universal Inc.,* 755 F.2d 898, 907 (Fed.Cir.) (noting that the function of witnesses, experts and otherwise, is to assist the court in determining and comprehending facts), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). The U.S. Supreme Court has set out four factors courts must consider when determining whether a claimed invention is invalid for obviousness: (1) the scope and content of the prior art, (2) differences between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, and (4) "objective" or "secondary" considerations, such as whether there was a long-felt need for the claimed invention, the failure of others, or whether the claimed invention has enjoyed commercial success.

*Graham,* 383 U.S. at 17, 86 S.Ct. at 693. The overall goal is to determine whether the claimed invention would have been obvious to a person of ordinary skill in the art at the time of the invention.

### III. Legal Standards

Summary judgment is appropriate if there are no genuine issues as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. My task is to determine that a movant meets its burden "by the quality and quantity of evidence required by the governing law *or* that he did not." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). As a result, to grant TSE's motion I must determine that a reasonable mind could only conclude that the patents are obvious by clear and convincing evidence. I may only grant Indian Head's motion if no reasonable mind could conclude by clear and convincing evidence that the innovations are obvious. Deciding each cross-motion for summary judgment requires me to evaluate the materials presented "in the light most favorable to the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)).

■ Although I am not bound by the Patent Examiner's ("Examiner") findings of validity, the cases make clear that those findings are entitled to some deference, particularly when the patent's challenger attempts to invalidate a patent based upon prior art references which were before the Examiner when he or she originally granted the patent. *See, e.g., Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 447 (Fed.Cir.1986), *cert. denied,* 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987). As a general rule, the Examiner's decision is "evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence." *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1555 (Fed.Cir.1985). The failure to cite prior art to the Examiner

lightens the patent challenger's burden. *EWP Corp.*, 755 F.2d at 905; *see also* 2 Donald S. Chisum, *Patents* § 5.06[2] (1993) (noting that the challenger's burden may be facilitated when he relies on important prior art not considered by the patent examiner).

## IV. Scope and Content of the Prior Art

It has been said that the starting place for determining obviousness is to imagine "the inventor as working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him." *In re Winslow*, 365 F.2d 1017, 1020 (C.C.P.A. 1966); *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1576 (Fed.Cir.1984). Although this "workshop" analogy has come under some criticism because of its potential to permit judges to slip into hindsight when deciding whether an invention is obvious, *see, e.g., id.*, it is clear that under *Graham*, any determination of obviousness begins with an evaluation of the scope and content of the relevant prior art.

■ An invention can be deemed obvious over either a single relevant prior-art reference or, as TSE alleges here, in view of what several references fairly teach in combination. *See, e.g., In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed.Cir.1986); *Cathodic Protection Serv. v. American Smelting & Ref. Co.*, 594 F.2d 499, 511 (5th Cir.), *cert. denied*, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979). The U.S. Court of Appeals for the Federal Circuit has stated, however, that "[t]he critical inquiry is whether 'there is something in the prior art as a whole *to suggest* the desirability, and thus the obviousness, of making the combination.'" *Fromson*, 755 F.2d at 1556 (quoting *Lindenmann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1458 (Fed.Cir.1984)). Further, a claimed structure may be obvious because it is suggested by the prior art, even though a particular benefit for the structure is not expressly disclosed in the prior art. *In re Dillon*, 919 F.2d 688, 692–93 (Fed.Cir.1990)

(en banc), *cert. denied*, 500 U.S. 904, 111 S.Ct. 1682, 114 L.Ed.2d 77 (1991).

■ TSE's list of relevant prior art pertains to truck and trailer brake actuators: U.S. Patent No. 4,031,814 ("Lukens '814"), German Patent No. 7308049 ("German Bosch '049"), French Patent No. 2.220.161 ("French Bosch '161"), U.K. Patent No. 2,000,225 ("U.K. '225") (also Canadian Patent No. 1,088,003), and U.S. Patent No. 3,101,133 ("House '133"). A brief description of these patents follows.[2]

### A. *Lukens '814*

The Lukens '814 patent discloses a dual-diaphragm spring-brake actuator similar in most respects to the actuators described in the Indian Head patents, except that it lacks the inelastically deformed securing member to attach the head to the aluminum flange. Lukens '814 holds the head, flange, and diaphragm together with a clamp band similar to the way that the service chamber is held together in the patents-in-suit. The Examiner did not cite this reference in the prosecution of the patents-in-suit, although, as Indian Head points out, the Lukens '814 patent essentially is the problem that the patents-in-suit were designed to solve.

### B. *French '161 and German '049 (the "Bosch patents")*

The Bosch patents depict a service chamber (as opposed to a power chamber) with a diaphragm compressed between the casing and the cover. The English translation of the German Bosch patent states that the cover flange is "placed behind" the casing flange "by means of a flaring." The English translation of the French Bosch patent states that the cover rim "is folded back over [the] entire circumference" of the casing flange. Both patents state that at least one of the two housing parts is made of sheet metal. Like the patents-in-suit, the Bosch patents actuate the truck or trailer brake through a

**2.** The parties also discussed other relevant prior art, namely U.S. Patent 3,244,079 ("Herrera '079") and U.S. Patent 3,478,517 ("Eggstein '517"). These other prior art references were considered by the Examiner (at least during his consideration of the '205 Patent). Herrera '079 seems to disclose a bottled clamp-band connection. Eggstein '517 relates to a service chamber, not a power chamber. These two patents add nothing to the analysis.

push rod. The Examiner did not have the Bosch patents before him when examining the patents-in-suit.

### C. *The U.K. '225*

The U.K. '225 Patent depicts a piston spring brake, not a diaphragm spring brake. It employs both a power spring similar to that used in the patents-in-suit and a crimping structure to hold the chamber head to the chamber body. The rolled-over connection is designed so that it "can only be readily released for service in the factory, and not in the maintenance garage so that the risk of injury to relatively unskilled personnel by the expansion of the spring is reduced...."

### D. *House '133*

The House '133 patent discloses an air-actuated single diaphragm "remote" spring brake and two housing structures, a rim, and a flange which is "crimped to provide an airtight seal." A diaphragm is secured between the crimped flange and the rim of the housing cup. House '133 actuators, like the actuators described in the patents-in-suit, contain a power spring. The file history contains a reference that the crimp contributes to the "unitary and safe nature of the motor casing." The Examiner explicitly considered this patent in its analysis of the '205 patent.

The term "remote" means that the power chamber depicted in House '133, unlike the power chamber in the patents-in-suit, is mounted some distance away from the service chamber and is connected to the rest of the braking system by a cable. The power spring is held in place by a staked nut which is attached to the cable. Like the patents-in-suit, the House '133 patent operates by injecting compressed air into the chamber, which presses on the diaphragm and compresses the power spring. This pulls on the cable, which in turn releases the vehicle brakes. TSE claims that the House '133 device is subject to stresses similar to those present in the patents-in-suit. While compressed, forces present in the chamber due to air pressure are equal or greater than the forces exerted by the spring when there is no compressed air.

## V. Differences Between the Patents-in-Suit and the Prior Art

The second prong of the *Graham* test requires me to ascertain the differences between the patents-in-suit and the relevant prior art. The parties have noted several such differences, the most notable of which are summarized below. I recognize that mere differences between the patents-in-suit and the prior art do not defeat TSE's obviousness claim. I delay my analysis of the import of these differences for Part VIII, *infra.*

### A. *Lukens '814*

Lukens '814, unlike the patents-in-suit, employs a clamp band and not an inelastically deformed lip to hold together the relevant parts of the power chamber.

### B. *The Bosch patents*

TSE claims that the patents-in-suit are closer to the German Bosch '049 and the French Bosch '161 patents than they are to any other reference. There nevertheless are several differences.

The most apparent difference is that the Bosch references teach a single diaphragm air brake [3] which employs a relatively weak return spring (exerting approximately 20 to 40 pounds of force) and not the 3000–pound power spring characteristic of the patents-in-suit. The Bosch patents also use sheet metal (for at least one of the housing members) instead of the cast housing member and the aluminum flange used in the patents-in-suit. Finally, Bosch does not mention that the crimping is designed as a safety device.

There is some dispute over whether the Bosch patents actually teach crimping. As

---

**3.** TSE argues that the Bosch patents internally suggest the use of a crimped closure structure on a double-diaphragm spring brake. In particular, TSE notes that the Bosch patents refer to the strap retainers or clamp bands employed in U.S. Patent 3,590,693 ("U.S. '693"), a double-diaphragm spring brake chamber. The reference to U.S. '693 discusses only the type of strap retainer used in that patent, however. The Bosch patents specifically state that they apply only to the type of diaphragm brake cylinder disclosed in U.S. 2,504,691, a single, service chamber device.

noted in Part IV, *supra*, the German Bosch patent states that the cover lip is "placed behind" the casing flange while the French Bosch patent states that the cover lip is "folded back" over the casing flange. Indian Head claims that the Bosch connection would not be strong enough to retain the constant force of a power spring and that the "rough contact area" in the Bosch device is insufficient to seal on the pressurized side of a dual-diaphragm brake actuator. TSE contests these claims.

### C. *The U.K. '225 Patent*

The crimp in the U.K. '225, unlike the patents-in-suit, only serves a single purpose: holding the actuator head to the casing. The crimped seal in the patents-in-suit must also hold the diaphragm in place while maintaining an air-tight seal.

A further difference is that the U.K. '225 patent employs a "circlip" which prevents persons from disassembling the actuator in the field without a specialized tool. This allegedly helps prevent injuries. (Indian Head also points out that there was no history of injuries from piston brake actuators.)

### D. *The House '133 Patent*

House '133 describes a single-diaphragm spring-brake actuator which is connected to the rest of the braking system by means of a cable. When the cable is connected to the truck (as it would be unless it were removed for repairs), the force of the power spring is contained by a staked nut connected to the cable, not by the lid of the actuator or the crimp. The patents-in-suit, by comparison, only use the cap and the crimp to keep the spring in the chamber.

The crimping prevents persons from removing the head in the field. Even if the head of the House '133 actuator could be removed, however, the danger presented is somewhat different from that presented by removing the head of the actuators described in the patents-in-suit. As the Examiner recognized, the power spring in the patents-in-suit will explode outward virtually unimpeded if the head is somehow removed. In the House '133 device, the cable, if attached to the truck, will prevent the spring from exploding.

If the cable is cut or if the actuator is otherwise removed from the truck for repairs, the spring will tend to explode away from the actuator housing. In that case, the spring still would have to bring the cable along with it. This would lead to drag along the conduit cable cover, impeding somewhat the spring's ability to explode away from the casing. The significance of the drag naturally will depend upon several factors, including the type and quality of the cable and conduit. If the cable is unbolted instead of cut, attachments at the end of the cable might also prevent the spring from exploding.[4]

House '133 also contains a slackening device which permits persons to release the spring tension without opening the brake or cutting the cable. The availability of this device reduces the probability that a person would cut the cable before removing the actuator head.

Finally, the diaphragm used in the House '133 patent has an extended lip which curls over the main surface of the diaphragm, unlike that used in the patents-in-suit which do not have this elongated lip. Indian Head claims that the longer, curled, lip helps assure that the crimped seal remains air tight.

### VI. Ordinary Skill in the Art

The parties have agreed that there is no real dispute regarding the education and experience level of a person of ordinary skill in the art. TSE's expert, former Commissioner of Patents Harry Manbeck, testified that the relevant level of ordinary skill in the art would be an individual with an engineering degree, some years' experience in the brake industry, and a degree of competence in the area of spring brakes. Indian Head's expert essentially agreed, contending that that individual would be a graduate engineer with

---

4. An air hose attached to the brake head of the House '133 also might diminish the danger from explosion. If the air hose is attached and the cable is not attached, the head and spring, if the head is opened, might only move a few inches.

The staked nut connecting the cable to the cable-retaining bracket further diminishes the danger posed when the head is removed. That the nut is staked makes removing the spring from the cable more difficult.

some years' experience with dual-diaphragm brake designs.

## VII. Objective Considerations

■ The final prong of the *Graham* test requires courts to consider various "objective" indicia of obviousness or non-obviousness. Objective evidence of non-obviousness includes "commercial success, failures of others, [and] long-felt need." *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1573 (Fed.Cir. 1992). Other objective evidence of non-obviousness is commercial acquiescence (licensing), 2 Chisum, *supra*, at § 5.05[3], professional approval, *id.* at § 5.05[4], copying, *id.* at § 5.05[5], and adoption by the industry, *Stratoflex*, 713 F.2d at 1539. *See also In re Hayes Microcomputer Prod., Inc. Patent Lit.*, 982 F.2d 1527, 1540 (Fed.Cir.1992) (noting that commercial success, failure of others, and the fact that a patent has become the industry standard are compelling evidence of non-obviousness). At this point in my analysis, I merely summarize the various contentions regarding the various objective factors. I analyze their importance in Part VIII, *infra*.

### A. *Long-felt need*

A long-felt need for the tamper-resistant spring-brake actuator would support Indian Head's position that the invention is non-obvious. The idea is that if the industry felt a need, yet failed to produce the innovation for a significant period of time, then the innovation must not have been obvious to those with ordinary skills in the art. 2 Chisum, *supra*, at § 5.05[1].

There is no serious dispute that the spring-brake industry long had felt a need for some way to prevent accidents due to the inadvertent opening of the power chamber of a dual-diaphragm spring-brake actuator by inexperienced persons. James Cumming, co-inventor of the House '133 patent and a witness for TSE, noted that the danger was known as far back as the 1960s. As TSE admitted in its own application for a patent teaching a "weld" instead of the crimp taught by the patents-in-suit, "unauthorized opening of the housing is potentially dangerous to the inexperienced mechanic...." It explained:

[I]t is ... conventional [in the spring-brake industry] to discourage unauthorized access, disassembly, and reassembly of the housing by appending a warning label to the housing and using a clamping means which is tamper-resistant....

Despite these relatively obvious safety precautions, the known clamping means can be removed by simple hand tools and the warning labels are exposed to dirt and road hazards and are thus effective only when the assembly is relatively new and not likely to require inspection or repair. Thus, there is a need for an improved spring brake housing that is even less prone to unauthorized disassembly and its consequent hazards.

Industry articles and reports of accidents support the conclusion that there was a long-felt need for some sort of device which would prevent accidents due to inadvertent opening of the power chamber. For example, as early as 1983, Motor Truck Magazine featured an article on the dangers posed by the power spring of a spring-brake actuator; part of the article emphasized the danger involved with opening the power chamber without first caging the power spring. Accidental removal of the wrong clamp band also has led to numerous personal-injury law suits against spring-brake manufacturers.

The industry's reaction to the threat of accidents also evidences the need for a safer double-diaphragm spring-brake actuator. Recognizing the danger presented by inexperienced persons opening the power chamber in the field, the spring-brake industry concocted various methods to prevent persons from opening the power chamber by mistake, such as placing a "sleeve" over the clamp-band bolt, using one-way bolts, using "safety ears" over the bolts, and attaching warning labels.

Although TSE does not seriously contest Indian Head's claim that there was a long-felt need for an effective way to prevent persons from inadvertently opening the wrong chamber,[5] it describes the need some-

5. TSE makes some attempt to argue that there is    no long-felt need at all. It points out that Indian

what differently. It maintains that the long-felt need was for a safety device to prevent tampering but which still permitted experienced mechanics to service the power chamber by first cadging the power spring. It notes correctly that the only way to open the power chamber of a tamper-resistant brake is to destroy the head; tamper-resistant brakes accordingly cannot be serviced and must be discarded if the diaphragm in the power chamber fails. TSE contends that completely tamper-resistant brakes only became desirable in the late 1980s in part because of an increase in products-liability litigation and because of the increased reliability and decreased cost of power-chamber component parts. Thus, TSE maintains that the "need" for a tamper-resistant brake was "short term" and was not "long felt."

TSE claims that several facts show that its version of the "need" is the correct one. First, it maintains that potentially interested parties never requested a tamper-resistant spring-brake actuator prior to 1986 and that Indian Head only was spurred to create its TR brake when its officers heard a rumor that a competitor, Anchorlok, was about to introduce a sealed brake. Second, it notes that there was no great market demand for available "explosion proof" and tamper-resistant spring brakes, such as the "Magnum" piston spring brake and the Indian Head "L" model. Finally, it points to Indian Head's own expression of doubt about the commercial value of a tamper-resistant brake. It notes that Indian Head's expert witness Benjamin R. Vian admitted that customers probably would not have bought a tamper-resistant brake before 1986 and that Indian Head internally decided that its marketing efforts should not emphasize the safety aspect of the TR brake.

## B. *Failure of others*

A further objective indicator of non-obviousness is the failure of others to solve the problem. Again, the rationale here is that if the patented solution were obvious, others would have come up with the solution first. Failed attempts to solve the problem thus show that the solution is not as obvious as it might appear in hindsight.

As noted above, the spring-brake industry, recognizing the danger presented by inexperienced persons opening the power chamber in the field, over the years concocted various devices to avoid accidents, such as placing "sleeves" or "safety ears" over the clamp bolts or attaching warning labels. The warning labels, which appeared as early as 1963, were inadequate because they often came loose or became obscured by mud and salt. The sleeves and safety ears could be easily removed with hand tools and accordingly proved to be an inadequate safety device.

TSE, continuing the theme it began when discussing long-felt need, simply rephrases the problem. It maintains that safety devices such as warnings and safety ears were designed to promote safe *disassembly* of the actuators; tamper-resistant brakes, TSE maintains, are designed to prevent disassembly altogether. As a result, TSE characterizes the problem Indian Head faced in terms of developing a tamper-resistant brake actuator, and not more generally as preventing injuries caused by inexperienced persons inadvertently opening the power chamber of a dual-diaphragm spring-brake actuator without first cadging the spring. Defining the problem narrowly, TSE then argues that there is no evidence that others failed in

---

Head officer (and co-inventor) Allen Gummer played down the safety motivations of the tamper-resistant brake in his deposition in a products liability suit against Indian Head. The deposition actually reveals that Gummer stated that "the idea, it had to do with safety" but that there was "no compelling reason ... to develop a sealed unit for any specific reason except to advance in technology, just to give us something to sell." (Gummer dep. in *Semones v. Indian Head Indus.*, at 40–41). That Gummer argued against negligence does not mean that there was

no long-felt need for an improved safety device. Indian Head contends, in fact, that the clamp-band type device *is* safe (if opened properly). It instead maintains that the patents-in-suit meet a long-felt need for an even safer dual-diaphragm spring brake actuator.

TSE's attempt to argue that there was no long-felt need to avoid accidents caused by inadvertent opening of the power chamber is especially odd considering its own assertion in submissions to the patent office that such a long-felt need exists.

their attempts.[6]

## C. *Commercial success*

Commercial success is also evidence of non-obviousness. *See* 2 Chisum, *supra*, at § 5.05[2]. The idea is that had the invention been obvious, inventors would have produced it earlier to reap the monetary rewards.

TSE does not seriously dispute that the tamper-resistant spring-brake actuator has enjoyed considerable commercial success.[7] Instead, it claims that there is no nexus between the commercial success and the patents-in-suit. It claims that the commercial success was due to factors other than the claimed innovation.

First, TSE argues that the commercial success enjoyed by Indian Head and Anchorlok is attributable to advertising efforts and to the dominance of these companies in the spring-brake industry. Second, TSE argues that the increase in sales of tamper-resistant brakes is attributable to the increase in the cost of repairing brakes (due to an increase in labor costs) and the decrease in the price of spring brakes. In short, it claims that customers bought tamper-resistant brakes not because they were safer, but because it was the cost-efficient thing to do. To bolster this conclusion, TSE points to Indian Head's marketing decision not to promote the safety aspects of the TR brake. Finally, TSE attributes the success of its own tamper-resistant brake (1) to the lower price of the tamper-resistant unit, (2) to TSE's enlarged sales staff, and (3) to Ted Smith becoming active in the operations of TSE Brakes.

## D. *Licenses*

Further objective evidence of non-obviousness is the fact that Anchorlok and Midland have taken out licenses for the Indian Head patents. *See Stratoflex*, 713 F.2d at 1539. That competitors have taken out licenses is deemed probative of non-obviousness because competitors presumably are persons who understand the industry (and the prior art). Such persons would not ordinarily act in a fashion contrary to their economic interests unless convinced of a patent's non-obviousness. 2 Chisum, *supra*, at § 5.05[3].

TSE disputes the nexus between these licenses and the patents' non-obviousness. It claims that Indian Head's and Anchorlok's market domination and their marketing efforts assured that competitors, to remain competitive, would have to manufacture a tamper-resistant brake actuator. It argues that Midland entered into a license agreement to avoid litigation over another Indian Head patent (its "continuous ring" spring-brake patent) and that Anchorlok entered into a "sweetheart" license agreement to settle an interference proceeding and to avoid long, drawn-out litigation.

## E. *Copying*

That others have copied the patent is also evidence of non-obviousness. *Avia Group*, 853 F.2d at 1564. *But see* 2 Chisum, *supra*, at § 5.05[5] (arguing that copying by an infringer should be given little weight in determining non-obviousness because one could value an innovation and still deny its validity). Here, the Examiner emphasized that both Anchorlok and TSE had copied Indian Head's patent. (TSE naturally contests that

6. There is some evidence that spring-brake manufacturers even failed in attempts to use a crimp instead of a clamp band to hold the power chamber together. For example, Anchorlok at one point experimented with crimping the head to the flange using a "Magneforming" technique. Only 11 of the 21 units so assembled worked, although these failures might be attributable to start-up engineering difficulties.

7. TSE's own production figures evidence the success of the tamper-resistant brake. It is clear, for example, that by 1993, TSE produced many more of its Tandem PC brakes than the corresponding clamp-band model, despite the fact that TSE first introduced the PC brake in 1990. (Ex.

771). The sales figures at other companies, including Indian Head's MGM division, mirror this trend.

TSE notes that the commercial success of Indian Head's tamper-resistant brake corresponded to a decrease in its sales of the predecessor clamp-band model. This is irrelevant. The facts show that the tamper-resistant brake enjoyed considerable success, both in terms of absolute sales figures and in terms of market share. That the TR brake supplanted the predecessor clamp-band model is evidence that customers are aware of each brake's benefits and have chosen the TR brake over other models.

it copied anyone's design). Further, Midland's marketing plan reveals that at one point it contemplated copying the Indian Head patent.

TSE maintains that there is no evidence that anyone copied Indian Head's designs. In addition, it disputes Indian Head's claim that Midland copied Anchorlok's design.

## VIII. Indian Head's Motion: Analysis of the *Graham v. John Deere* Factors

When considering Indian Head's motion, I must consider the facts most favorable to TSE. Although I must consider the *Graham* factors as a whole, for the sake of clarity, I begin with an analysis of the prior art.

### A. *Analysis of the prior art*

TSE maintains that the Lukens '814 patent, when combined with the House '133 patent, the Bosch patents, and the U.K. '225 patent suggest the patents-in-suit. It is clear that the prior art suggests that crimping can be used to hold two metal caps and a diaphragm together. Both the House '133 and at least the French Bosch patent, taking the facts most favorable to TSE, *teach* the use of crimping to hold an actuator head to the body. Further, the U.K. '225 patent shows that crimping can be used to contain the force of a power spring. It also is clear that the forces due to the spring and the air pressure present in the House '133 and the Bosch patents at times reach the strength of the forces present in the patents-in-suit. In addition, the prior art teaches that a crimp can be employed to hold a diaphragm in place and to maintain an air-tight seal. The prior art also teaches that crimping can serve as a safety device to deter untrained persons from opening a chamber.

What is unclear from a mere examination of the prior art, however, is whether it would be obvious to a person of ordinary skill in the art to combine these various features to come up with the patents-in-suit. The crimp in the patents-in-suit, unlike the crimps shown in the prior patents which teach the use of a diaphragm (House '133 and the Bosch patents), holds a force equal to or greater than the force exerted by the power spring during

its entire life. The forces on the crimp in the House '133 and the Bosch patents reach the magnitude of those present in the TR brake only some of the time. Furthermore, the force on the head in the patents-in-suit is concentrated at the points were the spring itself pushes against the cap. This potentially leads to an "oil-canning" effect in which the forces will tend to push the top of the cap outward while distorting the sides of the cap inward, thus placing additional stresses on the crimp. Although the crimp in the U.K. '225 consistently holds the force of a power spring, it does not serve the dual role of holding a diaphragm in place and keeping an air-tight seal.

The patents-in-suit also employ an aluminum flange, which might increase the risk that it will crack during the crimping process.[8]

The prior art also does not teach the use of crimping to hold a head, diaphragm, and flange together in the environment of the patents-in-suit. Dual-diaphragm brake actuators ordinarily are mounted on an axle of a truck and accordingly are subjected to numerous stresses, such as vibrations; Indian Head maintains that the devices shown in the prior art often are mounted in other, less hostile, truck locations. Further, none of the prior-art references teach the use of a crimp in a dual-diaphragm spring-brake actuator. Indian Head claims this is important because the crimp in the patents-in-suit is further removed from the axle and accordingly must withstand larger vibrational forces.

In addition, none of the prior-art references employ a crimp to solve a safety hazard of the magnitude usually presented by the predecessor clamp-band model. The U.K. '225 patent, unlike the patents-in-suit, employs a circlip which helps prevent the power spring from exploding out of the chamber if the cap were removed. The spring in the House '133 patent is attached to a cable which prevents it from exploding outward. While it is possible to tinker with the House '133 device and make it explode, it nevertheless does not present the same safety concern as that presented by the usual clamp-band model.

---

8.  TSE points out that the patents-in-suit do not          specifically call for an aluminum flange.

TSE acknowledges that there are differences between the patents-in-suit and the prior art. The parties nevertheless disagree about the weight I should assign to those differences: Indian Head claims that the differences are such that the prior art does not suggest the patents-in-suit; TSE argues that the differences—which it claims are "minutia and differences without distinction"—present simple engineering problems easily overcome by the "fine tuning" of a person possessing ordinary skill in the art. The question of obviousness accordingly boils down to determining the presumed mind state of a fictitious person: the person of ordinary skill in the art. The parties agree about the education and qualifications of this fictitious person, but disagree entirely about whether he or she would find the innovation obvious over the prior art.[9]

### B. Analysis of the objective factors

One reason objective considerations are so valuable in evaluating questions of obviousness is that they tell courts something about the postulated mind state of the person possessing ordinary skill in the art. See 2 Chisum, supra, at § 5.05. As Professor Chisum explains, determining obviousness from the prior art alone

> is a path fraught with pitfalls, including especially the inherent difficulty of making such a hypothetical judgment and the tendency to use (even subconsciously) "hindsight" and the inventor's own work to determine obviousness. The adversary system often fails to guide adequately the decision-maker along the path; in infringement trials, the opposing sides tend to offer conflicting expert testimony. · Consequently, the courts look to objective guideposts ... for aid and assistance.... The perceived utility of such guideposts is that they "focus attention on economic and mo-

tivational rather than technical issues and are, therefore more susceptible of judicial treatment than are the highly technical facts often present in patent litigation."
Id. (quoting Graham, 383 U.S. at 35–36, 86 S.Ct. at 702–03) (footnotes omitted).

There is some debate about the weight to be afforded these secondary or objective considerations. "The balanced and preferred view," however, "is that such 'secondary' considerations are always relevant to the question of nonobviousness, particularly to the issue under the Graham analysis of the level of skill in a given art but must be examined with great care to determine their actual probative value in a particular case." Id. (footnote omitted); see also Minnesota Mining & Mfg. Co., 976 F.2d at 1573 (noting that "objective evidence ... must be considered before a conclusion on obviousness is reached").

### 1. Long-felt need and failure of others

As I noted in Part VII, supra, Indian Head maintains that the patents-in-suit solved a long-felt need to prevent injuries to individuals by inadvertent removal of the bolted clamp band of the power spring chamber in the field. It argues that other attempts to solve this problem failed. TSE states the problem differently. It claims that the problem was to prevent injuries in the field while at the same time permitting servicing of the power chamber. Thus, it claims, there was no long-felt need for a tamper-resistant spring-brake actuator.

Disputes about the appropriate level of generality always carry with them a certain degree of arbitrariness. Stating a problem broadly enough, almost any step forward can be said to address a long-felt need. Defining the problem narrowly, however, makes it possible to describe any need in such a way that the claimed invention does not solve it.

---

9. The U.S. Court of Appeals for the Federal Circuit has stated that the person of ordinary skill in the art is analogous to another fictitious person: the reasonable person used to analyze tort negligence cases. See, e.g., Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1566 (Fed.Cir.), cert. denied, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). I question the usefulness of that comparison. In negligence cases, judges often can decide whether certain behavior is reasonable by comparing the facts in the particular case to the facts in cases with similar fact patterns. Metaphorically speaking, we know what the reasonable person would do because he or she has been there before. Patent cases involving obviousness ordinarily do not involve anything like a "similar fact pattern." The nature of patent law necessarily implies that each situation is new.

Defining a need or problem narrowly also tends to make most solutions appear obvious: the mere fact that there is an articulable need for a *precise* product is evidence that an alleged invention is obvious.

Most of the dispute in this case regarding the facts underlying a long-felt-need or a failure-of-others determination can be explained in terms of the dispute over these two levels of generality. TSE, for example, makes much of the fact that there was no specific market demand for tamper-resistant brake actuators.[10] Define the issue as TSE wishes, and the fact that customers never requested tamper-resistant spring brakes indeed is probative of a lack of a long-felt need. Define the issue as Indian Head wishes, on the other hand, and the lack of customer requests actually supports Indian Head's claim of non-obviousness: that there were no requests for a tamper-resistant spring-brake actuator tends to show that it was not an obvious solution to the problem.[11]

Indian Head complains that TSE presents no evidence to support its choice to characterize the long-felt need as a need for a serviceable brake. Strictly speaking, that charge is untrue. The very same evidence Indian Head uses to support its claim that a long-felt need existed for a way to prevent accidents also supports TSE's argument that the long-felt need was for a safe, yet *serviceable* brake actuator.

Nor does the alleged "failure of others" to solve the problem of inexperienced persons opening the power chamber without first cadging the power spring resolve the dispute over the appropriate level of generality upon which to concentrate. Stating that a particular solution to the problem "failed" necessarily implies a definition of the nature of the problem. Thus, if one defines the problem as Indian Head wishes, then devices such as warning labels indeed "failed" to solve the problem. Defining the problem as TSE wishes, however, it is clear that devices such as warning labels were attempts to solve a *different* problem than that solved by the patents-in-suit. Here, as with long-felt need, the existence or non-existence of this factor depends on how the question is framed.

### 2. Industry and consumer reaction to the alleged inventions

As noted in Part VII, TSE does not seriously contest that the tamper-resistant dual-diaphragm spring-brake actuator described by the patents-in-suit have been very favorably received by the industry and the market place. Instead, it claims that there is insufficient nexus between this success and the claimed innovation. I disagree.

The probative value of objective evidence necessarily depends on the nexus between the evidence and the claimed innovation. *Stratoflex,* 713 F.2d at 1539. The burden of establishing a prima facie case of nexus is on the patent owner. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392–93 (Fed.Cir.), 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988) (noting that after

---

**10.** TSE emphasizes Indian Head's marketing decision not to emphasize the safety aspect of the TR brake, concluding that this "admission" evidences a lack of long-felt need. I disagree. This "admission" is contained in a memorandum written by Indian Head's Allen Gummer in which he emphasizes the problem of selling the TR model against *other* models of Indian Head brakes. A "hard sell" of the TR brakes' safety aspect necessarily would be damaging to Indian Head's efforts to sell its clamp-band model. Further, the evidence reveals that safety in fact played a part in Indian Head's marketing strategy. For example, the name of the brake itself emphasizes that it is "tamper resistant."

Nor do I find merit in TSE's argument regarding the availability of the Magnum and "L" model brakes. The patents in this case involve dual-diaphragm spring-brake actuators. The Magnum brake is a piston brake. Furthermore, the "L" model does not completely solve the prob-

lem caused by tampering. It also is significantly larger than the TR brake and therefore is not applicable to many applications.

**11.** Of course, there is no requirement in the long-felt-need analysis that *customers* themselves have a subjective need for a solution to a particular problem. Instead, long-felt need is shown if the *industry* itself experiences an objective long-felt need. Here, the producers of the tamper-resistant brake had to explain the benefits of the brake to buyers. (*See, e.g.,* Ex. 653) (stating that Indian Head's "soft-sell" marketing strategy was "only to inform the reader-listener about the feature of the [TR brake] and ... to allow that reader-listener to make their [sic] own conclusion....") That the buyers themselves did not appreciate the need does not mean that none existed.

the patent owner establishes a prima facie case of nexus, "the burden of coming forward with evidence in rebuttal shifts to the challenger"). The only difference between the TR brake and the predecessor bolted-clamp-band model is the patented deformed connection. This establishes the required nexus between the claimed innovation and its success both in the market place and in the industry generally. TSE naturally attempts to break the causal link by claiming the tamper-resistant brakes' success is due to factors other than the innovation.

TSE attributes the commercial success of its own PC brake in part to its enlarged sales staff and to Ted Smith's increased involvement in business operations. Although this admittedly might explain why TSE's production and sales increased across all its models, it does not explain why the sales of TSE's *PC brake* dramatically increased' relative to TSE's non-crimped models.

That the commercial success of the tamper-resistant spring-brake actuator is attributable in part to advertising efforts does not refute the nexus between the commercial success and the claimed innovation. Marketing efforts are designed to communicate the benefits of a claimed invention to those in the market. That Indian Head and Anchorlok were successful merely means that they were able to communicate the benefits of the spring-brake actuator to the market.

Indian Head's and Anchorlok's dominance in the industry also does not refute the claimed nexus between the innovation and its commercial success. No doubt their status as industry leaders made their job of marketing the tamper-resistant brake a little easier. Still, the serviceable predecessor to the tamper-resistant brake remained available for purchasers to buy should they so choose. Indian Head's marketing strategy, for example, was "only to inform the reader-listener about the features of the product and, by the skillful use of information, to allow that reader-listener to make their [sic] own conclusions...." (Ex. 653). There is no dispute that once the benefits of the innovation be-

came clear to the purchasing public, the tamper-resistant device was seen as preferable.

Cost also may have contributed somewhat to the commercial success and industry acceptance of the tamper-resistant spring-brake actuator. One naturally would not expect tamper-resistant, "throw away" spring-brake actuators to sell if they were very expensive and repairing them fairly inexpensive—regardless of their value as safety devices. Still, the success of the brake also is due to the safety aspect of the crimp: were cost the only factor then one probably would expect the industry to crimp the service brake chamber just as the power chamber is crimped. There is no evidence that it has done so.

There also is evidence that various competitors have taken out licenses and/or copied the patented device. While TSE disputes the probative value of the licenses and disputes that there was any copying, the evidence is clear that the industry soon realized the value of the patented device and that it soon became an industry standard. Had the invention been obvious, someone, realizing its value, would have produced and marketed it earlier.

In sum, I have no doubt that numerous factors—most notably costs and marketing—contributed to the industry's favorable reaction to the device described in the patents-in-suit. Still, the role marketing played was merely to communicate the beneficial aspects of the innovation to the purchasing public. That the innovation was cost efficient also does not destroy the causal link between the innovation and its commercial success: no one would expect a non-obvious, yet exorbitant device to succeed commercially even if it somehow proved to be safer than another device. The facts, when taken in a light most favorable to TSE, prove that the tamper-resistant dual-diaphragm spring-brake actuator enjoyed significant commercial success and industry acceptance and that the safety aspect of the patents-in-suit contributed significantly to its desirability.[12]

---

**12.** The industry's reaction to the introduction of the tamper-resistant brake also resolves the ambiguity regarding long-felt need. That is, factors

such as commercial success, licensing, copying, and acceptance by the industry show that the problem solved by the industry is best character-

### C. Conclusion

Challengers to the validity of a patent bear a heavy burden. In this case, to stave off summary judgment, TSE had to prove that a reasonable fact finder could conclude by clear and convincing evidence that the innovations described in the patents-in-suit would have been obvious to a person reasonably skilled in the art. The facts most favorable to TSE reveal that TSE cannot meet that burden.

### IX. TSE's motion

In Part VIII, I found that the patents-in-suit are non-obvious as a matter of law. TSE's motion for summary judgment on the issue of obviousness accordingly is denied.

### X. Conclusion

For the foregoing reasons, IT IS ORDERED that Indian Head's motion for summary judgment on the issue of non-obviousness IS HEREBY GRANTED and TSE's motion for summary judgment on the issue of obviousness IS HEREBY DENIED.

---

ized generally as avoiding accidents caused by the inadvertent removal of the head in the field without first cadging the power spring. While it is true that some in the industry focussed on preventing accidents while maintaining the serviceability of the power chamber, the post-invention objective factors reveal that the need was for the most part less specific. The industry needed a way—tamper-resistant or not—to prevent accidents. The patents-in-suit solved that problem.